Good morning, Your Honors. If it pleases the Court, my name is Mark Diamond. I represent on a case-by-case basis, very factually oriented, and I think in this particular case there are several special facts that warrant reversal. First is that the property searched by the detectives without the owner's consent was a personal computer. And the Supreme Court has held in Riley v. California that a search of cell phones without a warrant is presumed improper because they're basically miniature personal computers and they hold, quote, vast quantities of personal information, close quote. That's true, said the Court, even when the search is incident to a lawful arrest, absent a special exception such as to protect the safety of the officers or possible spoliation of evidence, which didn't occur in this case. Judge Goldberg Was there any discussion in Riley about the private search exception? That wasn't applicable there, was it? Robert Fall Not in Riley. Judge Goldberg So you're, the position about Riley is that in devices like phones and arguably like computers, there is an interest of privacy. Robert Fall A heightened sense of privacy in those. Judge Goldberg But it doesn't, as I read it, undo the Jacobson private search exception as long as we fit within that. Do you agree with that? Robert Fall Yeah, I would agree with that if the private search exception applied. I don't agree with that, but I can get to that later. But you're right, Riley didn't address that exception. It addressed other exceptions, the possible spoliation, safety of the officers, but it didn't address this particular, this argument. The second special fact about this case is that the item search was taken from Mr. Paul's home. And your home is your castle. And again, there's a heightened sense of scrutiny when property is in someone's home. It requires a warrant, absent some special circumstance, which did not exist here. And there was no warrant. Police searched the laptop without a warrant and that laptop was taken from the home. So those are two factors that are peculiar to this case. Judge Goldberg It was taken by a private party. Robert Fall It was taken by a private party, correct. Judge Goldberg Okay. Robert Fall Do you want me to get to the private? Judge Goldberg I think we're interested in that, yeah. Robert Fall So I don't think that the private search doctrine applies in this case, and here's why. For the private search doctrine to excuse a warrantless search, there must be what the courts refer to as a reveal, quote, quote. What's a reveal? A reveal happens, and this was a Jacobson case, when the owner of the property gives permission, either implied or explicit, implicit or explicit permission to the third party to look at that private property. And that makes sense, because in a sense, it's a waiver. It's a waiver of the right to privacy. If you're sharing the information, Jacobson court said, quote, it is well settled that when the individual reveals private information to another, he assumed the risk that his confidant will reveal that information to the authorities. And if that occurs, the Fourth Amendment does not prohibit government use of that information. Judge Goldberg But Jacobson, wasn't that the Federal Express package? No one consented to that. They just, the delivery company opened it. There was no consent. Robert Fall So I would say two things. The Jacobson court uses the term reveal. My review of the cases is that generally it's when there's a reveal by the owner to the third party. But reveals can happen in a different way, and that's what happened in Jacobson. A reveal can happen spontaneously. What happened in Jacobson is that because, pardon my French, FedEx did a crocky job shipping the package, the package opened up. And the employees saw, in plain view, the cocaine, and then called the police. The police came and they saw, in plain view, the cocaine. They took some out and they tested it. So there was a reveal. It was just a different type of reveal. The reveal was a spontaneous reveal. It was just this guy's bad luck in Jacobson that the package happened to crack open. Nobody's going to say that you have to ignore what you see, the circumstances. But that's not what happened in our case. In our case, the boyfriend and the niece opened up the computer that was hidden under the bed. It was closed. It was powered off. And they searched it. And then they brought the information to the police. And the police, which is really what they should have done, they went through the laptop and they found all kinds of dirty pictures. And that was served as a basis of the warrant. Second argument about the Jacobson case is that there was another factor there that's not present in our case, which is that when you give property to a common carrier, I think you should expect, if you're reasonable, that somebody's going to find out what's in it. You're giving up your right to privacy to an extent when you give property to a common carrier. There was a case where the briefcase, the suitcase left in the airport unattended and was abandoned. The employee opened up a suitcase or contraband, called the police and showed it to them. But that, again, is an abandonment of a right to privacy. And it was a common carrier. So if you're shipping something through a common carrier, you're giving up this possibility that your right to privacy is going to be breached. That's not what happened in our case. What happened in our case is it was a secreted laptop in the guy's home. It was stolen out of the home by the niece, brought to the police, and the police relied on that. I don't know if that answers your question. Well, I understand the argument, but I guess Jacobson doesn't seem to sort of carve out all these nuances that you seem to be wanting us to carve out in this case. Only in the sense that Jacobson also talks about the term reveal. So what is a reveal? If somebody steals property and opens it up, is that a legitimate reveal? That's a slippery slope to get on. Then you're telling people, private parties, go into people's houses and look for whatever you want. If you find something suspicious, bring it to the police and that will be actionable. I don't know if that's... I wouldn't want to do that. I don't know if you folks want to do that, but it's a dangerous precedent. Let's assume that we don't agree with that, but there's the additional issue of whether or not the police exceeded the scope of the private search. So let's talk about that. Okay. So when the niece went to the police, and this is reflected in the warrant application, the niece said that she saw a picture of a little naked girl. That's all that she said, and also viewed a video, but didn't describe the video. The police did not ask her to describe what she saw. The police did not investigate whether she was a reliable witness, whether she had made these kinds of complaints before, and if so, whether they turned out. They just took the easy way out. They opened up the laptop and they searched it for themselves. The information, the claims made in the warrant application, far exceeded the information that was provided by the third party niece. But the testimony... I don't know if we're supposed to look just at the warrant application. The testimony from the motion to suppress, I think she said she clicked on the pictures and then watched at least one video. She didn't say for sure one video. She said that's all she was sure of. And then what we have, I think, it doesn't look like you're really challenging the first precincts, whatever they did. It looks like you're talking about headquarters search by Mr. Henderson or Officer Henderson, I think his name is. And he doesn't click on any of the single images as best I read the testimony. He looks at the thumbnails and he does open up two videos. So maybe he has one more video than her, but he's done less than what she did with regard to the still shots. How is that beyond the scope of what she did? I'm not sure that's true, Judge. I think that the testimony at the suppression hearing shows that the Officer Henderson and then afterwards Sweeney did a thorough search of the laptop. In fact, in the warrant and in his testimony, Detective Henderson said that he viewed two videos when at the suppression hearing, the niece testified that she only looked at one and the warrant served as the basis of the warrant application that she was not told about from the niece. Even if that was just what she had provided, wasn't that enough to get the search warrant? Wasn't this going to inevitably be discovered through a search warrant that was going to be obtained? She sees the nude picture. She's seen the video. I mean, search warrants are issued on a lot less than that. That's true. But in the warrant application, what she said was not included. So my point is if you exclude what the officers said, which is really the bulk of the affidavit, if you exclude that, if you find that that was improper, what's left is not enough probable cause to have issued a warrant. And I'll just refer you to the warrant application. She said, I saw a picture of a naked little girl. That's not enough. That's not necessarily pornographic. She may very well have seen porn. She probably did, but she didn't tell them that. And what was in the warrant doesn't justify issuing a warrant. The other thing that was in the warrant is that the neighbor supposedly saw a foal walk out onto the rooftop and throw the laptop onto the rooftop. That also is not probable cause. If that were the only thing that was in the warrant, the warrant wouldn't have been issued. It's his home. If he wanted to climb up on his roof, I mean, it's peculiar, but it's not a crime.  It's only suspicious if you take the information from the officer that there was child pornography there. Without that, if the neighbor called the police and said, you know, I saw my neighbor up on his roof and he threw a laptop off, they would have said fine. They never would have acted on that. And a court wouldn't have issued a warrant based on that. Well, that's clear, but of course, you're taking that in isolation. You've got the witness's child on the computer and the like. So you can't just take that statement in isolation and say that's not enough. The statement in the warrant? Well, the affidavit without the illegal evidence stated that SD discovered a laptop in Falls' house that contained child pornography and files indicating that the laptop belonged to Fall, that she saw an image of a naked girl on another laptop in Falls' bedroom and the statement you just referenced about the neighbor seeing Fall, it turned out that was a mistake. It really didn't identify him throwing a laptop onto the roof of his house. Getting back to Judge Cogburn's question, in a general run of things, that seems to be more than enough evidence to issue a warrant. May I take one second? The way I read this warrant, and I went through it a bunch of times, the warrant application, there's nothing, it was conclusory statements with no factual information about what she actually saw. And I think this court actually said in a case that nude pictures, even if a child, doesn't necessarily qualify as pornography. It's got to be a lewd exhibition. She never said that to them at the... Yeah, I think that was in the context of a trial and whether or not there was enough evidence to convict, but this is a probable cause. I'll refer to the record. I believe at the suppression hearing, she didn't give any of that information. And if you want, I can certainly submit recites, but it was in her testimony. It was brief. The testimony was not long. She did not give any specific information to lead the police officers to believe that the images were lewd, to the point that they would rise to child pornography. Okay. Thank you. Thank you very much, Your Honor. Thank you for your time. I have some time for rebuttal. Good morning, Your Honors. Excuse me. May it please the court. My name is Elizabeth Houston. I represent the United States. Your Honor, in terms of the private search, Detective Henderson's search or mimic search of what the niece brought to him is squarely within the wheelhouse of the Jacobson case that applies in this particular case. It was mimicking a private search by a private individual. In the lower court, the defendant's counsel admitted that there's no Fourth Amendment implications of the niece taking the computer to the police, that there was no Fourth Amendment because she was a private citizen. What's at issue here is whether or not what Detective Henderson did was reasonable, which is the cornerstone of the Fourth Amendment. The niece is at the house. She sees what she believes to be child pornography. She then goes into her, and she believes it's her uncle's. It's her uncle's house who lives with his parents as well. She goes into his bedroom, finds a second laptop computer, opens that up, sees child pornography on there. She leaves that in his bedroom because she's worried that he is going to find out that she has found this. She takes the one that's under the bed in the guest room, and she takes it immediately to the first precinct. The first precinct said, we need to go to headquarters and have a detective look at this. She brings it to the headquarters. Detective Henderson and Detective Sweeney are reasonable in that they interview the niece about what she saw, and they ask for specifics, and they ask specifically where she saw it. Where she saw it is when you turn on the laptop, it's on the desktop. It's the first page when you look at that. It's all the icons where you click onto your Word document, or you have. So Detective Henderson, who is a forensic examiner himself, wants to make sure that he keeps the integrity of the evidence as close to original as possible. He opens it up in her presence, and on the laptop, he sees thumbnail images of what appear to be little girls naked or engaged in sexually explicit activity. He doesn't drill down into any files. He just merely clicks on, I believe he said two videos. The niece said that she did at least one. Those were on the laptop, not with any folders, but clicked on that and confirmed what he already knew, or was pretty sure, that these were child pornography. He did that. It took a matter of seconds, maybe minutes, to do that, and they decided that they need to freeze the scene back at his house. So they send an officer, Officer Mockenhop, back to clear the house while they get a warrant, and then he and Detective Sweeney go and confront Mr. Fall at his workplace. They give him his Miranda. So Ms. Husey, are you saying that the officer in this case went no farther than the niece in the search? Are you saying that if he did, he acted reasonably? Your Honor, I'm saying if he did, and it's a little bit unclear based on the niece saying all I remember is at least one. He says he knows he did two. But I don't believe she said it was all thumbnails that were in plain view when he opened it up. He clicked on one instead of it just opening up to be a bigger picture, it ended up being a video. So I do think that is essentially the same. But what if there had been 14 or 15 thumbnails and she says I viewed one and he looks through all 15 of them, then what? I believe that she said that she looked at several, or she looked at many, and it was broader. However, what he did, if it was outside what she said, is de minimis. And in terms of Jacobson, they're looking at the degree of invasion of a Fourth Amendment expectation of privacy, and believe here, because it's so de minimis, if it was beyond the scope of what she did, and because it wasn't drilling down into the computer, that it would be fine under the Jacobson principles. You're saying he was just trying to verify. Absolutely. It was a narrowly tailored confirmatory search of what he has been already told specifically and very reasonably of what he was supposed to do. And then they attempted to go talk to Officer Fall, and instead of using an exigent circumstance, because the minute he finds out that they're at his house or know what's going on there, he's going to go back, which is what he did. He went back and he put the computer that was on, this is after he was being confronted by the police, and after he spoke with his mom, who said the police have secured the house, went back, got into his backyard, goes into a room in the back, and then puts that computer, which is where the majority of the child pornography was found, at least in terms of what was charged, onto the roof, and that's what the neighbors saw. And the police, while they were drafting their warrant, had that information and included that in the warrant. And as Justice Congren pointed out, the independent source doctrine could also apply here, because if you take out, and in our brief, we do take out the information that Detective Henderson saw from his... I think you just demoted Judge Cogburn. I called him Justice Cogburn. I'm sorry, I'm sorry, Your Honor. Sorry, Your Honor. I don't know if he's going to take offense. I'm not going to take offense. Yeah, something else might be... I apologize. However, if you take that out, there is probable cause there. She says, and it is conclusory in the warrant, that she stated she saw naked children, and then it says she saw a video that contained child pornography. It doesn't spell out what the exact child pornography. She said, but if you take that portion out of it, the warrant still stands. Now, Mr. Dimon says that child pornography, what does that mean? There is obviously a trial. You would have to show, obviously, that these were images of a child. But do we need to be that fine when it comes to a warrant? There have been particular cases, Your Honor, where they want more. And some districts and some magistrate judges want the actual pictures attached to the warrant so they can determine, especially in lewd and lascivious circumstances, which for best practices is not necessarily a bad practice. However, is it necessary based on the... depending on who is writing the warrant and their experience, and if they are described, they may know additional things. They may not know that everything is put in the warrant. I think it could be sufficient. And the bottom line is the validity of the warrant for the house. No one talks about that there is any bad faith, that there is anything wrong with what the searching agents, they were relying on a valid warrant or what they perceived to be a valid warrant for the house. And none of these issues, or none of the other issues show bad faith and that we could rely on that. And that is probably the easiest venue to go to. And that is not even alleged here. Let me ask something. This may be a little unfair. So I kind of apologize because I don't think it has been briefed in this issue, in this case. But at 645 of the JA, there is a stipulation signed by... that the defendant agrees to the facts that go to the heart of the warrant. In the next case, one of your colleagues from the Eastern District is saying that moves the issue here. And I'm curious that that was raised in the case we are going to take up next, but not in this case. Is there any reason why it's not? I'm not criticizing that. Don't get me wrong. I'm just trying... I'm just curious as to why that's an issue. The nuances of how that stipulation came about, Your Honor, resulted in sort of a compromise to kind of push the trial along. We didn't admit anything except... we didn't admit the actual laptop that Denise brought in into court. We spoke about it. We didn't admit any of the images. And by not doing that, we wanted... the defense agreed to that. So whether or not it was a trial, I don't think necessarily. No, I think the issue is does it moot the defendant's appeal? Does it create a situation where you have independent evidence? That's what y'all are arguing in the next case and you're not arguing it in this one. I get the reason to speed things along. That's typical. I think that happens a lot. And I'm just curious as to why it looks like it's being raised by the same office in some cases and in others. Your Honor, I think there can be a differentiation between what the police did. Because you can have cocaine in a locker or in a house and if they didn't get a warrant to get in there, people can admit it. But is it going to be thrown out? Is it going to be admissible? Another issue, I believe. And maybe that's... I'm splitting hairs there. But I do think that it could be differentiated. Though in hindsight, I mean, if the court believes it's moot, then we completely support it. I'm not suggesting we do. I'm just trying to figure out why we're dealing with it in one case and not the other. Right. And Your Honor, I don't know if you want to... There's three other arguments. I do want you to talk about these receipt convictions because I have some concerns about them, particularly given where these images were actually stored in the cache of the computer. Yes, Your Honor. And they were in the temporary internet files, which is sometimes called the temporary internet cache, which is different than your typical cache, which is unallocated space. Like if you're deleting something and it just happens to still be there. So this is in the temporary internet files, meaning that you had to click on this and you had to look on it on the internet in order for it to be saved in the temporary... Well, how do we know that? Because the temporary... Your computer automatically saves it when you're doing it in order... Yeah, but as I understand it, it may save it without you even seeing it. There is an argument about that, Your Honor. However, this particular defendant had over 700 in his temporary internet files. And if you look at the totality of the evidence, and in this particular case... So are you saying that some of those 700, some of them were actually permanently stored on his computer? He had videos that were permanently stored and active. That also appeared on the cache? The videos, I can't hear them. A video is not going to necessarily appear on your temporary internet file. It may be cached in a different way, like thumbnails or thumbs. I mean, the problem is you have to show knowing receipt and you're relying almost exclusively, I think, exclusively on circumstantial evidence, which is not... There's nothing wrong with that, but the question is whether there's enough of that here. We believe there is, Your Honor. And in this particular case, the defense counsel made a very effective argument and brought this up ad nauseum during the trial to the jury and made this exact argument. And the jury, who is the finder of fact in terms of intent, is always the finder of fact, found that there was sufficient evidence or there was a beyond reasonable doubt to show that he got these exact files. And so what was that evidence? Your Honor, it was a totality of the circumstances and it was all circumstantial, which can be used to prove intent. In this particular case, and to differentiate from the Dobbs case and the other cases that were cited and that this Court will probably be looking to, in the Dobbs case, which is the Tenth Circuit case, it was one device, one computer. He had 150 images on it, all in the temporary Internet files, and it was a period of collecting child pornography over six months. In this particular case, we had an old Dell computer that was found in Mr. Fall's bedroom. Over 130 images all from the Internet, from their banners, you could tell from the top of the banners and that sort of thing, which you're going to see on the top. He also had CDs and DVDs, I think six or seven, that contained over 1,900 images of child pornography and 21 videos of child pornography, some of those dating back to 2010. Now, if you remember, this was a 2016, 2017 case showing six or seven years of collecting. Then we have the laptop that was found in the bedroom where they admitted that there was child pornography on there, and that was an old laptop. The newer laptop, the HP laptop that was found on his bed had over 700 images in the temporary Internet files as well as videos in the active space. Those were from March 2016. Then he continues on his technology and his using various technologies to look for and keep his child pornography. He had a Dropbox account that had over almost 3,000 videos of child pornography in 2015 and over 300 images. So you take that along with him creating... But how does that prove that these three specific images on the cache were knowingly received? I'm still having trouble with that. Your Honor, the circumstantial evidence the government believes in totality, and you look at the totality of the circumstances, was enough to show that this is a savvy child pornography collector that used it for many, many years, using many types of technology as well as different media. He had the three computers, the DVDs, a cloud storage box on Dropbox. It's not by mistake or accident. I think what Dobbs and the others are concerned about is that you have this unwitting defendant that just happens to be charged, this poor man charged with child pornography. Well, that's one scenario. There could also be a not-so-unwitting defendant who certainly loves to keep and possesses porn, but at least with respect to these particular three images, he had no interest in viewing them or keeping them. Your Honor... What you would do, what Judge Diaz is talking about, when you use circumstantial evidence, it is a line of circumstances that include direct things that lead to a particular fact being true. So in this case, do you have anything that shows that he knew that these images that were being stored, where these three images were, that were being collected by his computer? In other words, had he shown that on at least one occasion he knew that these things were being stored on his computer without him doing anything? Your Honor, I think that the totality of the circumstances show that he knows every single one thing that he found on the Internet was going to be found by law enforcement, and that's one of the reasons that he took that laptop and he put it up on the rooftop. He knew it was on there. But you seem to be saying, and maybe this is your argument and we can assess it, but you seem to be saying because you think in the totality of the circumstances, some of the pornography was viewed that you should be, the jury was, it was okay for the jury to infer that these three images were viewed. Yes, Your Honor, because this is a savvy computer, Your Honor, computer user. So you're saying because you, there was evidence, for example with videos and search terms and some of the stuff, that he looked at some images, that's enough for us to, for the jury to infer? I mean, keep in mind, your indictment is very narrow. It's three images. We're entitled to transfer that to those three? Is that your position? Yes, Your Honor. I think that we showed enough intent in general to show about those specific images because of his longstanding history. And is it enough to show that he viewed them as opposed to that they were actually stored on, he understood that they would be stored on this particular cache? I do, Your Honor. I believe that when you're looking at an image and you have control of whether or not and what you're looking for, you're not looking for it unknowingly or unwittingly. You're having a direct, a purpose of when you're looking at these, that you do have control over those images of when you are viewing them. Whether or not you choose to distribute them or delete them. And, Your Honor, I think it's also important to show that we also charged intent in these particular receipt counts too. Did he attempt to get these? Does that necessarily mean that he had to actually receive them? No. Did he attempt to receive them? Yes. By looking at, it appears to be a very regular basis based on the amount and the time of period that Mr. Fall is engaged in this. Let me ask a question just, and this really has nothing to do with the merits, but what was it about these three particular images that caused the government to want to charge him with a receipt given where they were found? Your Honor, those were the, on that particular computer, those were the images that, all the images were in the temporary internet files, if not unallocated. If they're unallocated, you usually don't have a date range at all. You know, it just came on there at some point and was probably deleted. But I guess my point is you had so much other stuff here. Not for that particular computer, Your Honor. Oh. And what, at least, you know, to give a little insight, because we know that he received it through the internet, we have the jurisdictional nexus of that in case other, you know, if they somehow show that this computer was created in Virginia. I think always showing the nexus of receipt, that it was through the internet, is a stronger argument or a stronger jurisdictional element for receipt counts. That's just based on my experience. Kind of following up on that, not really on the receipt count, but the transportation of the video count. Yes, sir. I guess what the evidence showed was that it was moved from a computer to the Dropbox account. Yes. Is that right? We could show it was on one of the disks. Then it later went on to the computer. And then it was later put on Dropbox. Well, are you saying disk to computer? Are you really going to argue, maybe you are, that disk to computer? I know you can say that equipment was manufactured abroad. That's not the basis for our transportation. The transportation was the computer to the cloud internet, yes. Like taking your luggage on the airplane from here to someone else, you're transporting it. Well, that's, I mean, it's interesting questions to think about what's transportation with internet. I mean, you know, would emailing it to yourself be transportation? Under the same circumstances, yes. Do you think emailing a picture of child pornography to yourself is sufficient interstate commerce? Yes, your honor. And those have been charged before, I'm not sure. Do you think if you have it on your phone and it's backed up to the iCloud? If it's not knowing, your honor, then it wouldn't be charged. If you know it's being backed up to the iCloud, is that transportation? Most people who know anything about, I don't know hardly anything about computers, so I might have a good defense if I were to say that. But, I mean, most people know that stuff's backed up to the iCloud. Would that be enough to be transportation? Your honor, in this particular case, we didn't have to worry about that because we could show it. We're going from one place to the other. You have a position on it just for the sake of discussion as I try to wrestle with these issues? I mean, I think that if this is someone who was an avid collector and making sure that he backed up and saved every single thing and had this backed up, I mean, especially off the default settings, then, yeah, I think there would be an argument for that. Thank you. Thank you. Mr. Diamond? Thank you, Judge. Just briefly, I think your concern is well-founded. Because of the Internet, a lot of things that were not federal crimes before are not going to become federal crimes. And it's a slippery slope we're on. We really need to find out where to draw the line. Concerning the good-faith exception, it doesn't apply because the good-faith exception applies to save evidence an officer obtains as a result of a warrant he objectively believes is valid. Even if the warrant is later deemed to be invalid, there wasn't a warrant in this case. So the good-faith exception doesn't apply. And as far as what Detective Henderson thought he was told or thought he said that he saw child pornography, I'll just read one very brief portion of his testimony at this pressure hearing. Detective Henderson said, I opened the computer and I saw icons on the desktop that appeared to be nude individuals. Question, did they look like children? A, they could have been. This is at Joint Appendix 93 to 94. So I guess that's it. Thank you very much for your time, Your Honors. Thank you. Mr. Diamond, my docket, you can stay there. My docket shows that you are also a court appointed. Again, we appreciate the important work that you and others do on behalf of our court. We could not resolve these cases without the work of lawyers such as you. So thank you very much. We'll come down and greet counsel.
judges: Albert Diaz, A. Marvin Quattlebaum Jr., Max O. Cogburn Jr.